**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **ADRIENNE L. PADGETT,**<br>*individually and on behalf of persons*<br>*similarly situated,*<br><br>        *Plaintiff,*<br><br>*v.*<br><br>**CLARITY SERVICES, INC.,**<br><br>        *Defendant.* | No. _____ |

---

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff, Adrienne L. Padgett, brings this action, individually and on behalf of others similarly situated, against Defendant, Clarity Services, Inc. ("Clarity"). Clarity has unlawfully reported illegal, void, and uncollectible loans from installment loan and "payday" lenders, such as Plain Green, LLC ("Plain Green"), as having a balance due on Plaintiff's consumer report in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681e(b), violating her legally protected reputational rights and putting her at risk for denial of credit, housing, and/or employment.

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

2. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391 because Clarity resides in this District and the violations giving rise to Plaintiff's claims occurred in this Division.

## II. PARTIES

3.    Plaintiff, Adrienne L. Padgett, is a resident of Gainesville, Florida. Ms. Padgett brings this action on behalf of herself and a class of similarly situated persons who had void and uncollectible loans from Plain Green inaccurately reported as having a balance due on their Clarity credit reports and also on behalf of a subclass who had balances inaccurately reported as past due.

4.    Defendant Clarity Services, Inc. ("Clarity") is a Delaware corporation with its principal place of business in Clearwater, Florida. Clarity operates as a subsidiary of Experian plc.

## III. INTRODUCTION

5.    Like old-fashioned "loan sharks," online payday and installment lenders'[1] business model is to take advantage of poor (and increasing numbers of middle-class) Americans who have no savings to cover unexpected expenses. They charge unconscionably high interest rates, typically exceeding 300%. Unwitting, or simply desperate, consumers often receive only a few hundred dollars, but end up owing thousands of dollars in interest. These usurious interest rates can make it difficult or impossible for consumers, already in difficult financial straits, to ever free themselves from debt.

---

[1] The term "payday loan" is generally recognized as a loan of short duration, typically two weeks, coinciding with the borrower's next payday. An "installment loan" is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. In many states, the consumer finance laws address the legality of "payday loans" and "installment loans" through the same lending statutes. Plaintiff may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiff and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to loans by unlicensed lenders, such as Plain Green, made to borrowers at usurious interest rates in the "Included States," as that term is defined below.

6.     Seeking to protect their citizens from such exploitation, many states have outlawed high-interest, small-dollar loans. Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Massachusetts, Montana, New Jersey, New York, North Carolina, Ohio, Oregon, Vermont, Virginia, and West Virginia (the "Included States") have gone even further, passing laws that high-interest loans for amounts of $3,000 or less are void and uncollectible. The Included States so strongly disapprove of usurious payday and installment loans that, as a matter of public policy, their legislatures have decided that spurious "loans" in violation of their statutes are not legally due. Attempting to evade these state laws, payday lenders, such as Plain Green, nevertheless offer high-interest loans to residents of the Included States over the internet.

7.     Payday lenders, such as Plain Green, openly admit that they do not follow the Included States' laws. Flouting all legal accountability, they baselessly contend that no state or federal laws may be applied to them because they falsely claim "sovereign immunity" through spurious associations with Native American tribes. For example, Think Finance, LLC created Plain Green in association with the Chippewa Cree Tribe, using the rent-a-tribe business model to falsely claim that the business interests share the privileges and immunities enjoyed by the Tribe. The Tribe, however, receives less than five percent of the business revenue and is in no sense the true owner of the payday lender. Moreover, it is well established that Native American tribes (even if Plain Green were a truly sovereign entity) are subject to state consumer-protection laws when they operate businesses outside tribal reservations and deal with state-resident consumers who are not members of the tribes, as Plain Green does.

8.     The three major national credit reporting agencies ("CRAs")—Equifax, Experian, and TransUnion—and their subsidiaries—such as Clarity—occupy a key position of trust in modern American financial life. Any American who wishes to apply for a job, a home mortgage, insurance coverage, or any kind of credit is well advised to first check his or her

credit report. Inaccurate or negative information on these widely used, authoritative reports places consumers at risk of being denied credit, a job, or housing, or paying more than they otherwise would for credit or insurance.

9.   Though a subsidiary of Experian, plc, Clarity serves a different market than its parent company. Clarity reportedly operates as a real-time credit bureau addressing credit risk management solutions for the under-banked, non-prime consumer segment. Clarity has a less stringent credentialing process and gathers data that is not the subject of Experian's consumer credit reports. Clarity sells consumer data to payday lenders and their lead generators for the purpose of targeting vulnerable customers who may be interested in such loans. Clarity regularly includes information reported by Plain Green in its consumer reports, including reporting illegal, void, and uncollectible loans made to residents of the Included States.

10.   Clarity's decision to inaccurately report loans from Plain Green by residents of the Included States as if they were legally valid and collectible is not only objectively inaccurate as a matter of clearly-established legal rules, it also adds a veneer of legitimacy to Plain Green's illegal conduct. By placing its "stamp of approval" on void and uncollectible loans, and by reporting past-due balances when consumers exercise their legal rights not to repay these illegal loans, Clarity undermines the Included States' public policy and aids and abets Plain Green's illegal scheme.

11.   Plaintiff brings this action on behalf of herself and a Class of all residents of the Included States who Clarity inaccurately reported had a balance due to Plain Green, as well a Subclass of residents of the Included States whose payday loans Clarity inaccurately reported as past due.

12.   All purported loans by Plain Green to residents of the Included States are void and uncollectible as a matter of clearly established law, as Clarity either knew or recklessly ignored.

13. Despite the fact that these loans are void and uncollectible, Clarity routinely, systematically reported amounts as having a balance due from the Class members to Plain Green. This systematic policy of reporting void and uncollectible debts as due and owing violates the FCRA's requirement that CRAs follow "reasonable procedures" to ensure the "maximum possible accuracy" of consumers' credit reports. 15 U.S.C. § 1681e(b). Plaintiff and the Class members accordingly suffered injuries to their statutorily protected reputational rights, as well as being exposed to the risk that they might be denied a job, housing, credit, or insurance; pay more for credit or insurance than they otherwise would have; or pay debts they did not owe in order to avoid negative information appearing on their credit reports.

## IV. FACTUAL ALLEGATIONS

### A. Adrienne Padgett's Plain Green Loan and Payment History

14. On or about January 9, 2018, Plaintiff, Adrienne Padgett, took out a short-term installment loan from Plain Green for $1,600.

15. At the time of the loan, Plain Green informed Ms. Padgett that payments of $196.54 would be withdrawn from her bank account every two weeks.

16. Ms. Padgett was not told by Plain Green that (a) it is an unlicensed lender in the state of Florida; (b) she would be making payments ending in July 2019; (c) her finance charges for the loan would be $6,259.85 (for a total of $7,859.85 in payments on the void and uncollectible loan); or (d) the annual percentage rate for her loan would be 317%, which is more than 15 times the legal interest rate under Florida law and more than seven times the rate defined as criminal usury.

17. Under Florida law, Plain Green's sham loan to Ms. Padgett is void and uncollectible as a matter of clearly-established law. Because Plain Green is not licensed to

make loans in Florida and because it charges interest at rates that far exceed those permitted by Florida law, Ms. Padgett has no obligation to make payments to Plain Green.

18.   Despite the fact that loan is void and uncollectible, Ms. Padgett made a payment of $700 to Plain Green in February 2018.

**B.   Clarity's Credit Report Data on Ms. Padgett's Plain Green Loan**

19.   Clarity issued a credit report about Ms. Padgett, dated July 13, 2018.

20.   As reflected in the Clarity credit report, Plain Green reported to Clarity that it made an unsecured loan of $1,600 to Ms. Padgett on January 4, 2018.

21.   The Clarity credit report indicates that Ms. Padgett has been a resident of Gainesville, Florida at all times relevant to this litigation.

22.   The Clarity credit report also indicates that Ms. Padgett has been employed by the University of Florida in Gainesville, Florida at all times relevant to this litigation

23.   Clarity was aware that Ms. Padgett was a Florida resident at the time that she completed the Plain Green loan application.

24.   Clarity's credit report on Ms. Padgett identifies and reflects payment delinquencies on the illegal and void Plain Green debt.  Specifically, the "past due" and "balance" amount on the Plain Green loan is reportedly $3,031. The "manner of payment" information specifies that Ms Padgett had a "real time installment" loan that has been charged off; further, the "amount manner of payment" indicates a charge-off amount of $6,062.

**C.   Clarity's Report of the Plain Green Loan Harms Ms. Padgett's Credit**

25.   Ms. Padgett's credit report identifies a delinquency in the payments to Plain Green for illegal and void debts. In fact, it purportedly ballooned to a past due amount of $3,031. The report also indicates that the debt has been Charged Off.

26. The report is inaccurate because it reports that amounts are unpaid and charged-off when in fact, under clearly-established Florida law, the spurious loan to Ms. Padgett is void and uncollectible.

27. As a matter of clearly-established law, no amounts are, or ever were, due and owing from Ms. Padgett to Plain Green, as Clarity easily could have and should have discovered but knowingly or recklessly ignored.

28. As a result of Clarity's reporting of this information, Ms. Padgett was denied her statutory right that Clarity must follow reasonable procedures to assure maximum possible accuracy of the information that it reports about her credit history, violating her legally protected reputational interests and exposing her to a risk of being denied credit, housing, employment, or insurance; of paying more for credit or insurance than she otherwise would have; of paying money she did not owe in order to avoid negative information appearing on her credit report.

29. Clarity disclosed and reported the delinquent payment history on Plain Green's void and uncollectible debts to third parties through credit inquiries.

## V. CLASS ACTION ALLEGATIONS

### A.  Clarity Must Screen the Furnishers of Credit Data

30. Clarity must accurately transcribe, store, and communicate consumer information received from a source that it reasonably believes to be reputable.

31. Clarity must establish and follow procedures to screen potential furnishers of credit data in order to be reasonably certain that the data received is valid and accurate.

32. Clarity puts prospective furnishers through an initial security screening and credentialing process. Screening generally includes an inspection of features of each business such as its physical headquarters, phone number, website, and business license, as well as company records such as annual reports. The screening and credentialing process also may

include consultation with in-house or third-party investigation services that screen for illegal or unethical business history.

33.   After the initial screening and inspections, Clarity may re-inspect its new furnisher, including re-inspections after risk events such as consumer complaints, suspicious trade lines, variations in data submissions, anomalies, and changes in company ownership.

34.   When a credit reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems.

**B.   Clarity Knew or Recklessly Ignored that Plain Green's Loans were Void and Uncollectible in the Included States**

35.   Plain Green is not a licensed lender in any of the Included States (or, indeed in any state in the United States).

36.   Plain Green operates via the internet in the Included States (and, indeed in every state in the United States).

37.   Plain Green provides unlicensed lending services to borrowers.

38.   The list of lenders licensed to make loans in the Included States is publicly available information. The Nationwide Multistate Licensing System ("the NMLS") is a nationwide platform and the leading public resource for evaluating whether a lender is licensed. www.nmlsconsumeraccess.org (last visited July 20, 2018). The NMLS is the system of record for non-depository, financial services licensing or registration in participating state agencies, and it is the official system for companies and individuals seeking to apply for, amend, renew and surrender license authorities managed through NMLS by 63 state or territorial governmental agencies.

https://mortgage.nationwidelicensingsystem.org/about/Pages/default.aspx (last visited July 20, 2018).



https://mortgage.nationwidelicensingsystem.org/news/Pages/ExpandedUse.aspx (last visited July 20, 2018).

39.   Additionally, most, if not all, of the Included States have regulatory authorities that make information about lenders' license status available to the public, including for example: Arizona Department of Financial Institutions, Arkansas Securities Department, Connecticut Department of Banking, Florida Department of Financial Regulation, Georgia Industrial Loan Commissioner, Georgia Department of Banking, Illinois Department of Financial and

Professional Regulation, Indiana Department of Financial Institutions, State Bank Commissioner of Kansas, Maryland Department of Financial Regulation, Massachusetts Division of Banks, New Jersey Department of Banking, New York Department of Financial Services, North Carolina Commissioner of Banks & Financial Institutions, Ohio Department of Commerce, Oregon Department of Financial Regulators, Virginia Bureau of Financial Institutions , and West Virginia Department of Financial Institutions.

    40.  Plain Green's website plainly discloses, as Clarity in the exercise of minimal diligence could have and should have discovered but knowingly or recklessly ignored, that the interest rates it charges are in excess of the applicable statutory interest-rate caps in all of the Included States:

    a.  "Your loan's total cost depends upon the amount that you're approved for and your payment history. For example, the Annual Percentage Rate (APR) for a loan of $700 is 413.00% with 24 bi-weekly payments of $106.43." https://plaingreenloans.com/Faq.aspx (last visited July 20, 2018).

    b.  The loan calculator for Plain Green's lending practices indicates loan repayment at a rate of 438% interest. https://plaingreenloans.com/LoanCost.aspx (last visited July 20, 2018).

    41.  Plain Green's unlicensed practice of extending high-interest loans, which are void and uncollectible as a matter of law in the Included States, has been the subject of national news, such as:

> Payday loans typically come with high interest rates that can add hundreds or thousands of dollars to the original loan amount and trap poor borrowers in a cycle of debt. For this reason, ***many states have cracked down on payday lenders. Fourteen states and the District of Columbia ban payday loans altogether, and all of the remaining states regulate payday lending to some degree*** . . . .

"Too many hardworking people are trapped by the manipulative tactics of payday lenders, from exorbitant interest rates to deceptive debt collection practices," New York Attorney General Eric Schneiderman told The Huffington Post. "Law enforcement agencies must stay vigilant in order to protect families from scammers and illegal lenders looking to exploit them." . . . .

Plain Green makes small, short-term, high-interest loans to people all over the country who have no other source of credit. Although the company is nominally owned by the Chippewa Cree, the tribe has little actual involvement in its operations and receives a tiny fraction of the revenue generated by the business.

The tribe has received an estimated $28 million to $32 million from Plain Green since it was created, according to documents obtained by HuffPost that were filed in tribal court as part of a case between the tribe's former chairman and other tribal leaders that involves the agreement with Think Finance. A March 11, 2011, agreement between the tribe and Think Finance submitted as an exhibit in that case says that Plain Green had received 4.5 to 5.5 percent of the revenues collected by the operation, meaning Think Finance and other third parties received an estimated $500 million to $700 million. . . .

"*The very purpose of an online lender affiliating with a tribe is specifically and expressly so that they can lend in violation of state laws*," Ellen Harnick, a payday lending expert at the Center For Responsible Lending, told HuffPost. And it's the poorest Americans — the ones who need quick cash to address the most pressing issues in their lives — who are most at risk.

*State regulators have taken numerous measures to protect borrowers, passing laws limiting the size and frequency of short-term loans and setting maximum interest rates that lenders can charge borrowers. Laws in 14 states and D.C. that outlaw payday lending make online, high-interest installment lending illegal as well.* The Consumer Financial Protection Bureau is also in the midst of writing the first federal payday lending regulations. . . .

The Think Finance-Plain Green business model is representative of these growing online payday lending operations. The loans, and millions of dollars of fees paid to Think Finance, pass

> through Plain Green and circumvent state regulations, while the real work of running the lending business happens elsewhere. Thanks to Think Finance's online lending platform, Plain Green is able to make loans all over the country. Eventually, the loans end up owned by a Cayman Islands servicing company. And Plain Green, which cites the Chippewa Cree's sovereignty in its lending agreement with customers, says that state and federal regulators have no legal standing to complain. . . . After entering into its arrangement with the Chippewa Cree, Think Finance also made deals with two other tribes: the Otoe-Missouria in Oklahoma, which run Great Plains Lending, and the Tunica-Biloxi in Louisiana, which run MobiLoan.

Ben Walsh, "Outlawed By The States, Payday Lenders Take Refuge On Reservations," (posted June 29, 2015, updated Dec. 6, 2017) https://www.huffingtonpost.com/2015/06/29/online-payday-lenders-reservations_n_7625006.html (emphasis added) (last visited July 20, 2018).

42.    Plain Green's illegal practices have been well recognized for more than five years. For example, in June 2012, the U.S. Consumer Financial Protection Bureau issued Civil Investigative Demands to Plain Green and other payday lenders, investigating unlawful practices relating to the advertising, marketing, provision and collection of small-dollar loan products in violation of Federal consumer protection laws.  The CFPB investigation led to litigation against Plain Green's loan originator, Think Finance, for its "participation in the collection of void loans." https://files.consumerfinance.gov/f/documents/cfpb_think-finance_complaint_112017.pdf (last visited July 20, 2018). The litigation received media attention that Clarity knew about or recklessly ignored:

> The Consumer Financial Protection Bureau filed a lawsuit against Think Finance LLC, alleging the company collected payments on debts consumers did not owe.
>
> The CFPB's complaint, filed in United States District Court District of Montana, alleges that Think Finance, an online loan servicer based in Addison, Texas, "collects on loans that are void under state laws governing interest rate caps or the licensing of lenders," according to a news release from the CFPB. The loans are void under laws in 17 states.

These actions are violations of the Dodd-Frank Act and Consumer Protection Act, according to the CFPB.

"The bureau alleges that Think Finance made deceptive demands and illegally took money from consumers' bank accounts for debts that were not legally owed. The CFPB seeks to recoup relief for harmed consumers and impose a penalty," the news release said.

Think Finance has extended credit and collected payments online since 2011 and also provides software technology, analytics and marketing services to financial clients in the consumer lending industry, according to the complaint. The company also provides similar services, including extending credit and collecting payments, on behalf of three lending businesses owned by Native American Tribes: Great Plains Lending LLC, MobiLoans LLC and Plain Green LLC, according to the complaint.

Specifically, the CFPB alleges that Think Finance charged interest rates "high enough to violate usury laws in some states where they did business and violation of these usury laws renders particular loans void."

The company also allegedly did not obtain licenses to issue loans or collect payments in certain states, a practice that also renders particular loans void, and made electronic withdrawals from consumers' bank accounts and demanded payments by phone or in writing.

https://www.acainternational.org/news/cfpb-files-federal-lawsuit-against-online-loan-servicer

(last visited July 20, 2018).

43. Additionally, Plain Green has been the subject of reports related to its marketing and lending practices in the context of other litigation:

Great Plains Lending and Plain Green Loans have stopped marketing new loans pending the outcome of a court case in which the NY Attorney General sued another payday lender for offering loans in the State of New York. Both these lenders are operated by Think Finance as tribal entities under the premise that they can export their tribal laws into states. The New York

regulator's position is that it has the authority to regulate tribal lenders doing business in New York. They sent cease-and-desist orders to many online payday lenders offering loans New York.

Both Great Plains Lending and Plain Green Loans stopped marketing in the middle of August 2013 and very briefly re-started marketing on Oct 1, 2013 but quickly stopped again after The U.S. District Court for the Southern District of New York ruled in favor of New York. It ruled that the state can regulate lenders making loans to New York state residents even when loans are originated from offices on tribal land.

Since reporting on this change at the end of 2013 we have not seen a change in marketing from either Great Plains Lending or Plain Green Loans. There has been a notable industry-wide shift away from the tribal lending model. Or, to be more specific, we have seen tribal lenders taking a more stealth mode to marketing while new entrants have entered the space but are all pursuing the state license path. It appears Think Finance, the main operators of Great Plains and Plain Green, is taking the same approach. They continue to invest online marketing dollars into, Rise Credit, their other short-term loan business, while stopping with the other two.

https://www.thepaydayhound.com/learn/great-plains-lending-and-plain-green-loans-stop-marketing/ (originally published Oct. 3, 2013; updated Nov. 14, 2015) (last visited July 20, 2018).

44.   Plain Green admits in its standard loan agreement that it does not follow the laws of the Included States (or any United States state or federal law), instead claiming that it is not subject to the laws of any state of the United States. Flouting the consumer-protection authority of the sovereign states in which it does business, Plain Green entirely ignores state law and sees United States federal law as an optional, non-binding "guideline," stating in its standard loan agreement that it will "voluntarily use certain federal laws as guidelines for the provision of services."

45.   Plain Green holds itself out as a tribal governmental lending arm of the Chippewa Cree Tribe of the Rocky Boy's Reservation in Montana. However, it plainly does business in

the Included States—off of the tribal reservations and, thus, beyond the Tribal sovereign legal authority. Moreover, Plain Green has a high-volume internet business, extending loans outside tribal lands with citizens of the Included States, who are not members of the Tribe. It is well established that even if Plain Green were a sovereign entity, it is still subject to applicable state and federal law when it conducts business outside of tribal lands with consumers who are not members of the Tribe. *See Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

### C. Clarity Knowingly Adds Inaccurate Data about Plain Green's Void and Uncollectible Loans to Consumers' Credit Reports

46. Clarity is a consumer reporting agency that provides consumer reports to lenders and other creditors.

47. Plain Green contracts with Clarity to furnish consumer credit data.

48. To obtain the ability to compile and furnish credit data about their borrowers to Clarity, Plain Green had to undergo an application and credentialing process, pay a membership fee, and obtain corporate software from Clarity.

49. In the process of applying to Clarity for furnisher status, Plain Green provided information about its business practices, which may have included on-site inspection(s) by Clarity representatives.

50. Through the application and screening process and/or its re-inspection regarding Plain Green, Clarity knew or should have known:

    a.  Plain Green is not licensed to make loans in the Included States;

    b.  Plain Green charges interest on its loans at rates that are usurious and illegal based on the laws of the Included States; and

    c.  Plain Green has no legal basis to pursue collection of its borrowers' debts in any United States state or federal court in the Included States.

### D.  State Laws Prohibit the Collection of High-Interest Loans by Unlicensed Lenders

51.  Many states have enacted strict laws that govern the terms of short-term, small-dollar consumer loans, often referred to as "payday" loans or "installment" loans. State lending laws usually limit the amount of interest that can be legally charged and often impose licensing and/or regulatory requirements on lenders. Some states outlaw the concept of payday lending, while others impose civil and criminal usury penalties for violation of state laws. Such laws reflect the states' strong public policies to protect state residents from abusive lending practices.

52.  The Included States have passed laws that loans made in violation of the interest rate caps and/or licensure requirements are void as a matter of law, and the lender has no right to collect any principal, interest, or other charges. In other words, if a lender ignores the law and makes an illegal loan, the borrower has no obligation to repay the loan, and the lender has no legal basis to collect money from consumers. These Included States are:

53.  **Arizona**. In Arizona, there is an interest rate cap of 36 percent plus a five percent finance fee. Ariz. Rev. Stat. § 6-632 (Consumer Lenders Act). "[A] person, whether located in [Arizona] or in another state, shall not engage in the business of a consumer lender without first being licensed," and this licensing requirement cannot be avoided by "any device, subterfuge or pretense." Ariz. Rev. Stat. § 6-603(A) and (B). If a lender makes a loan of $10,000 or less without a license, the unlicensed lender has no right to collect any principal, finance charges, or other fees in repayment of the consumer's loan. Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-602(B), 6-603(A), 6-613(B).

54.  **Arkansas**. Under Arkansas law, interest charged on consumer loans may not exceed an annual rate of 17 percent. Ark. Const. amend. 89, § 3; Ark. Code Ann. §§ 4-57-104, 4-57-105. All contracts "having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest." Ark. Const. amend. 89, § 6(b).

55. **Florida**. Consumer loans by an unlicensed lender to Florida residents may not exceed 18 percent. Fla. Stat. §§ 516.01(2), 516.03, 516.031. Any loan agreement that charges interest at a rate greater than permitted by statute is not enforceable. Fla. Stat. §§ 516.02(2)(c), 687.071(7).

56. **Georgia**. For loans of $3,000 or less with interest charged at an annual rate exceeding eight percent, the lender must be licensed by the state. Ga. Code Ann. §§ 7-3-6, 16-17-2. Otherwise, the lender is in violation of the Georgia Industrial Loan Act and the Payday Lending Act. *Id.* Under such circumstances, the lender is barred from collecting on the indebtedness, because such transactions are "void *ab initio*." Ga. Code Ann. §§ 7-3-29(a), 16-17-2, 16-17-3.

57. **Illinois**. Under the Illinois Consumer Installment Loan Act, a lender must be licensed to engage in the business of making loans of $40,000 or less, including "small consumer loans" of $4,000 or less. 205 ILL. COMP. STAT. §§ 670/1, 670/15(b). Lenders cannot charge more than 99% interest, even if they are licensed. 205 ILL. COMP. STAT. §§ 670/15(b), 670/17.2(a)(1); *see also* 815 ILL. COMP. STAT. § 205/4(1). If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILL. COMP. STAT. § 670/20(d).

58. **Indiana**. Under Indiana law, if a lender makes a consumer loan without first obtaining a license, "the loan is void and the debtor is not obligated to pay either the principal or loan finance charge." Ind. Code §§ 24-4.5-3-502(3), 24-4.5-5-202.

59. **Kansas**. A lender must be licensed to engage in the business of making supervised consumer loans. Kan. Stat. Ann. § 16a-2-301(1). If an unlicensed lender makes such a loan, the loan is void and uncollectible. Kan. Stat. Ann. § 16a-5-201(2).

60. **Maryland**. The interest rate charged to a Maryland borrower may not exceed 33 percent per year. Md. Code, Com. Law § 12–306(a)(6)(i), 12–313(a)(1), 12–314(a), 12–314(c). If the interest or fees exceed this amount, the loan is unenforceable, and the lender may not receive or retain any principal, interest, or other compensation for the loan. Md. Code, Com. Law § 12–314(b). It is also illegal to attempt to collect principal or interest on a loan that was made by an unlicensed lender. Md. Code, Fin. Institutions Law § 11–204; Md. Code, Com Law § 12–302; *see also* Md. Collection Agency Licensing Bd., Advisory Notice, Unlicensed Consumer Loan and Prohibited "Payday" Loan Collection Activity (July 20, 2009).

61. **Massachusetts**. In Massachusetts, for loans by an unlicensed lender for $6,000 or less where the interest and expenses on the loan exceed 12 percent per year, the lender (or subsequent purchaser of the loan) has no right to collect money for repayment of the loan, including its principal. Mass. Gen. Laws ch. 140, §§ 96, 103, 110; Mass. Gen. Laws ch. 209, § 26.01; Mass. Gen. Laws ch. 271, § 49. Any loan made by an unlicensed lender in violation of Massachusetts law is void. Mass. Gen. Laws ch. 140, §§ 96, 110.

62. **Montana**. A lender must be licensed to engage in the business of making consumer loans. Mont Code. Ann. § 32-5-201(1). If an unlicensed lender makes such a loan, the loan is void, and the lender "does not have the right to collect, receive, or retain any principal, interest, fees, or other charges." Mont. Code Ann. § 32-5-103(4).

63. **New Jersey**. New Jersey law requires that all consumer lenders be licensed in the state. N.J. Stat. Ann. § 17:11C-3(a). A loan made without the requisite license is void, and "the lender shall have no right to collect or receive any principal, interest or charges." N.J. Stat. Ann. § 17:11C-33(b).

64. **New York**. New York prohibits any person or corporation not licensed by the state of New York from charging, taking, or receiving any interest at a rate exceeding annual interest of 16% on covered loans. N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1). Loans

that exceed the maximum allowable interest rate are void. N.Y. Gen. Oblig. Law § 5-511; N.Y. BANKING LAW § 356; *see also Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986) ("[A] usurious transaction is void ab initio . . .").

65. **North Carolina**. In North Carolina, the maximum legal rate of interest may not exceed 36 percent. N.C. Gen. Stat. §§ 53-173, 53-176(a). Additionally, lenders must be licensed by the state to make loans of $15,000 or less. N.C. Gen. Stat. §§ 53-166(a). Loans that violate these provisions are void, and the lender has no right to collect, receive, or retain any principal, interest, or other charges. N.C. Gen. Stat. § 53-166(d).

66. **Ohio**. In Ohio, no person shall engage in the business of lending money in the amount of $5,000 or less without first having obtained a license. Ohio Rev. Code Ann. § 1321.02. Any loan made without the requisite license is void, and "the lender has no right to collect, receive or retain any principal, interest or charges." Ohio Rev. Code Ann. § 1321.02.

67. **Oregon**. Under Oregon law, a lender must be licensed to make a loan of $50,000 or less, unless the annual interest rate does not exceed the greater of 12 percent or five percent in excess of the discount rate. Or. Rev. Stat. §§ 82.010, 725.045; *see also* Or. Rev. Stat. § 725A.020(2) (license requirement for payday loan). Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. Or. Rev. Stat. § 725.045(1)(b).

68. **Vermont**. Vermont imposes a tiered set of interest-rate limits, dependent on the amount of the consumer loan – 24 percent on the first $1,000 and 12 percent on the remainder, or 18 percent, whichever rate is greater. Vt. Stat. Ann. tit. 8, § 2230. Additionally, lenders must be licensed by the state to make loans. Vt. Stat. Ann. tit. 8, § 2201. Loans that violate these provisions are void, and the lender has no right to collect on the loan. Vt. Stat. Ann. tit. 8, § 2215(d)(1).

69. **Virginia**. In Virginia, a person may not charge an annual interest rate exceeding 12 percent without first obtaining a consumer finance license from the Commonwealth Va. Code §§ 6.2-1501(A), 6.2-303(A). It is illegal for an unlicensed lender or its affiliated entities to collect or receive any principal, interest, or charges on a loan with interest in excess of 12 percent; such agreements are void *ab initio* under Virginia law. Va. Code § 6.2-1541(A) ("A loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501.").

70. **West Virginia**. Under West Virginia law, a lender must be licensed to make a loan at an interest rate that exceeds 18 percent interest. W.Va. Code §§ 46A-1-102(38), 46A-4-101. Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. W.Va. Code § 46A-5-101(2).

71. Plain Green charges interest rates far in excess of 36 percent on all of its loans and is not licensed to extend loans in the Included States. Thus, in the Included States – Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Massachusetts, Montana, New Jersey, New York, North Carolina, Ohio, Oregon, Vermont, Virginia, and West Virginia – Plain Green's loans are void and uncollectible as a matter of clearly-established law.

**E.  Congress Regulates the Reporting of Adverse Information to Protect Consumers**

72. In enacting the FCRA, Congress has determined that consumers' rights to have truthful information reported about their financial affairs—which has long been protected by the common-law torts of libel, defamation, and slander—merits additional, stricter statutory protections in the credit-reporting context. A person's reputation as reflected in his or her credit report is vitally important to participating in the central activities of life in the United States. Employers, lenders, and landlords use consumer reports to screen applicants, borrowers, and tenants. Inaccurate, adverse, or derogatory information on a credit report invades consumers' statutory reputational rights and puts consumers at risk of being denied a job, credit, housing,

or access to other means by which to live; of paying more than they otherwise would for credit or insurance; or of paying money they do not owe in order to avoid negative information appearing on their credit reports.

73. A "consumer" is defined in the FCRA as "an individual." 15 U.S.C. § 1681a(c). A "consumer report" is defined in the FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumers eligibility for... credit." 15 U.S.C. § 1681a(d).

74. A consumer reporting agency is any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. §1681a(f).

75. Recognizing that the content of consumer reports can have a significant impact on people's lives, Congress has chosen to regulate the procurement, use, and content of those reports through the FCRA, 15 U.S.C. §§ 1681a, *et seq.*

76. The FCRA is intended "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union LLC*, 617 F.3d 688, 706 (3d Cir. 2010).

77. To achieve its goals, Congress has required that CRAs "follow reasonable procedures" … "to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

**F. The Class and Subclasses**

78. Plaintiff brings this action on their own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Class and Subclass:

> **Class**:
>
> All persons residing in Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Massachusetts, Montana, New Jersey, New York, North Carolina, Ohio, Oregon, Vermont, Virginia, and West Virginia (the "Included States"), who took out a loan from either or both Plain Green, LLC ("Plain Green") for $3,000 or less and have had a consumer report prepared by Clarity during the past five years in which Clarity reported that there was a balance due to Plain Green.
>
> **Past Due Subclass:**
>
> All persons residing in the Included States who took out a loan from either or both of the Plain Green for $3,000 or less and have had a consumer report prepared by Clarity during the past five years in which Clarity reported that an amount was past due to Plain Green.

Excluded from the Class and Subclass are any employees, officers, or directors of Clarity, any attorneys appearing in this case, and any judges assigned to hear this case as well as their immediate family and staff.

79. **Ascertainability**. The Class and Past Due Subclass are ascertainable in that they comprise individuals who can be identified by reference to purely objective criteria, including information from consumer report files in Clarity's business records. The relevant information to determine Class and Subclass membership includes (1) all consumer credit reports that indicate a balance due on a purported loan from Plain Green; (2) all consumer reports that

indicate amounts were past due from Plain Green; (3) the addresses of the subject consumers. Notice may be mailed to Class and Subclass members using the information in Clarity's files, as updated through the National Change of Address Registry and other commercially available means.

80. **Numerosity**. The Class and Subclass are so numerous that joinder of all members is impracticable. Although the precise number of Class and Subclass members is not currently known, the large numbers of people who have been the victims of high-interest, illegal loans by Plain Green, and the near-ubiquity of Clarity's credit reporting in American commercial life, including its use by employers, landlords, and lenders of all kinds throughout the United States, shows that the Class and Subclass likely consist of at least thousands of persons and, therefore, it would be impracticable to bring all these persons before the Court as individual plaintiffs.

81. **Typicality**. Plaintiff's claims are typical of the claims of each member of the Class and Past Due Subclass she seeks to represent. These claims all arise from the same operative facts and are based on the same legal theories.

82. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the Class and Past Due Subclass. Plaintiff is committed to vigorously litigating this matter, and their interests are aligned with those of the Class and Subclasses whom they represent. Plaintiff has retained counsel experienced in handling FCRA and consumer class actions.

83. **Commonality and Predominance**. Common issues of law and fact exist regarding Plaintiff and the Class members' claims, including:

     (a)  whether Plain Green is a licensed lender in the Included States;

     (b)  whether Plain Green's loans are extended at interest rates that exceed the maximum legal rate in the Included States;

(c) whether Plain Green's loans are void and uncollectible in the Included States;

(d) whether Clarity violated 15 U.S.C. § 1681e(b) by reporting Plain Green's loans on Class members' consumer reports;

(e) whether Clarity violated 15 U.S.C. § 1681e(b) by reporting Plain Green's loans were past due and/or owing on Class members' consumer reports; and

(f) whether Clarity's violations were negligent, intentional, willful, or malicious.

84. **Superiority.** A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class and Subclass members in individually controlling the prosecution of separate claims against Clarity is small, as actual damages would be difficult and expensive to prove and the maximum statutory damages recoverable by any one Class member is limited to $1,000 under the FCRA. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual cases.

85. **Injunctive Relief Appropriate to the Class.** Fed. R. Civ. P. 23(b)(2). This action should also be maintained as a class action because Clarity has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI. CAUSES OF ACTION

### Count One – Reporting of Illegal and Void Debts to Plain Green is a Willful Violation of 15 U.S.C. § 1681e(b)

### (On behalf of Plaintiff and the Class)

86. Plaintiff restates each of the allegations in the preceding paragraphs as if fully set forth here.

87. Clarity is a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

88. Plaintiff and members of the Class are "consumers" as that term is defined by 15 U.S.C. § 1681a(c).

89. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

90. Clarity violated the FCRA, 15 U.S.C. § 1681e(b), by inaccurately reporting balances due to Plain Green on Class members' consumer reports, despite the fact that reasonable procedures designed to ensure the maximum possible accuracy of the information would have shown that Plain Green's spurious loans to the Class members were void and uncollectible.

91. Clarity's FCRA violations are willful because it knew or recklessly ignored the clearly-established law, making Plain Green's loans void and uncollectible in the Included States.

92. It was objectively unreasonable for Clarity to knowingly and/or recklessly report this data in light of the clearly-established state laws.

93. Clarity's conduct has injured Plaintiff and the Class members by depriving them of their statutorily protected reputational rights and/or putting them at risk of being denied employment, housing, insurance or credit; of paying more than they otherwise would for credit or insurance; or of paying a debt they did not owe to avoid negative information appearing on their credit reports. The conduct, action, and inaction of Clarity were willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

94.   Plaintiff and other members of the Class are entitled to recover costs and attorneys' fees, as well as appropriate equitable and injunctive relief, in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

**Count Two – Reporting of Illegal and Void Debts to Plain Green as
Past Due is a Willful Violation of 15 U.S.C. § 1681e(b)**

**(On behalf of Plaintiff and the Past Due Subclass)**

95.   Plaintiff restates each of the allegations in the preceding paragraphs as if fully set forth here.

96.   Clarity violated the FCRA, 15 U.S.C. § 1681e(b), by inaccurately reporting amounts as past due and/or owing to Plain Green on the Past Due Subclass members' consumer reports, despite the fact that reasonable procedures designed to ensure the maximum possible accuracy of the information would have shown that Plain Green's sham loans to the Subclass members were void and uncollectible.

97.   Clarity's FCRA violations are willful because it knew of or recklessly ignored the clearly-established law, making Plain Green's loans void and uncollectible in the Included States.

98.   It was objectively unreasonable for Clarity to knowingly and/or recklessly report this data in light of clearly-established state laws.

99.   Clarity's conduct has injured Plaintiff and the Past Due Subclass members by depriving them of their statutorily protected reputational rights and/or putting them at risk of being denied employment, housing, insurance or credit; of paying more than they otherwise would for credit or insurance; or of paying a debt they did not owe to avoid negative information appearing on their credit reports. The conduct, action, and inaction of Clarity were willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

100. Plaintiff and other members of the Past Due Subclass are entitled to recover costs and attorneys' fees, as well as appropriate equitable and injunctive relief, in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

## VII. CONCLUSION AND PRAYER

101. Wherefore, Plaintiff Adrienne Padgett, individually and on behalf of others similarly situated, prays for judgment ordering relief as follows:

(a) certifying the Class and Past Due Subclass pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or 23(b)(2);

(b) appointing Plaintiff to represent the Class and the Past Due Subclass;

(c) appointing Plaintiff's counsel as Class Counsel;

(d) declaring that Clarity is financially responsible for notifying all Class members about this suit;

(e) enjoining Clarity from further violations of 15 U.S.C. § 1681e(b);

(f) finding that Clarity's violations of 15 U.S.C. § 1681e(b) were willful;

(g) awarding Plaintiff and the Class and Subclass members actual damages pursuant to 15 U.S.C. § 1681o, punitive damages, consequential damages, and statutory damages pursuant to 15 U.S.C. § 1681n;

(h) awarding Plaintiff and the Class and Subclass members pre-judgment and post-judgment interest;

(i) awarding Plaintiff and the Class and Subclass members reasonable attorneys' fees, expenses, and costs of suit, pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o(a)(2), the common fund theory, or any other applicable statute, theory, or contract;

(j) granting leave to amend the Complaint to conform to the evidence produced at trial; and

(k) awarding such other relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, Adrienne Padgett, demands a trial by jury on all claims so triable.

Dated: August 3, 2018.

Respectfully submitted,

**BRANDON J. HILL**
Florida Bar Number: 0037061
**LUIS A. CABASSA**
Florida Bar Number: 0053643
**WENZEL FENTON CABASSA, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main Number: 813-224-0431
Direct Dial: (813) 379-2565
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: twells@ wfclaw.com

And

Michael A. Caddell (*pro hac vice* forthcoming)
mac@caddellchapman.com
Cynthia B. Chapman (*pro hac vice* forthcoming)
cbc@caddellchapman.com
John B. Scofield, Jr. (*pro hac vice* forthcoming)
jbs@caddellchapman.com
Amy E. Tabor (*pro hac vice* forthcoming)
aet@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston TX 77007-1722
Telephone: 713-751-0400
Facsimile: 713-751-0906
**Attorneys for Plaintiff**